# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SECURITIES AND EXCHANGE
COMMISSION,
    *Plaintiff*,

  v.

No. 3:20-cv-01353 (JAM)

HAI KHOA DANG *et al.*,
    *Defendant*.

### ORDER GRANTING MOTION FOR ENTRY OF DEFAULT JUDGMENT

This case concerns a scheme by an investment adviser whose alleged conduct over the course of more than a decade eventually led to the loss of 99% of a married couple's retirement savings. The Securities and Exchange Commission ("SEC") initiated this action against defendant Hai Khoa Dang, alleging violations of the Investment Advisers Act of 1940. After Dang failed to appear, the SEC moved for default entry, which I granted. The SEC now moves for default judgment. I will grant the motion and order injunctive relief, disgorgement with prejudgment interest, and civil penalties.

### BACKGROUND

The following facts are taken from the SEC's complaint and assumed to be true for the purposes of this ruling. The SEC filed this action against Dang, an investment adviser and resident of Manchester, Connecticut, alleging that Dang defrauded a married couple, Clients A and B, in violation of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-6(1), 80b-6(2).[1]

Dang has at times been registered as a representative with several different registered broker-dealers and investment advisers, and has previously maintained various state and

---

[1] Doc. #1.

Financial Industry Regulatory Authority ("FINRA") securities licenses.[2] Dang left the last registered firm he was associated with in 2006, and has not since been affiliated with another registered broker or investment adviser; nor has Dang renewed any of his securities licenses or registrations.[3] According to the SEC, Dang has continued after 2006 to advise individual clients as an unregistered investment adviser.[4]

In 2012, a former client filed a complaint with FINRA alleging that Dang, while employed at a registered broker-dealer in 2006, improperly borrowed about $180,000 from the client in violation of FINRA rules and never repaid the loan.[5] The client also alleged that the client "suffered investment losses as a result of Dang's investment recommendations when he was an unregistered investment adviser."[6]

In November 2016, the State of Connecticut's Department of Banking issued a Cease and Desist Order, finding that Dang "had engaged in dishonest or unethical practices in the securities business."[7] The Order became permanent in December 2016, and Dang did not contest the Order.[8]

Dang first met Client A and Client B, a married couple who live in Connecticut, in the 1990s when Dang, as a registered representative with a broker-dealer firm, made a presentation to Client A and others at Client A's place of business.[9] Client A decided to invest a large portion

---

[2] *Id.* at 4 (¶ 13).

[3] *Id.* at 4 (¶ 14).

[4] *Ibid.*

[5] *Id.* at 4 (¶ 16).

[6] *Id.* at 4-5 (¶ 16).

[7] *Ibid.*

[8] *Ibid.*

[9] *Id.* at 5 (¶¶ 17-18).

of his and Client B's retirement funds at the broker-dealer firm at which Dang worked.[10] According to the SEC, by 2001, Dang "was the only person advising Clients A and B about their retirement planning."[11]

Between 2001 and 2006, Clients A and B followed Dang as their broker and adviser as he moved to different firms, moving their funds along with him.[12] After 2006, when Dang was no longer working at any registered firm, Dang had one of his former colleagues, Mr. Y, named as the new registered representative for Clients A and B's accounts.[13] Clients A and B asked Dang about this arrangement, and Dang told them that he still worked for or with Mr. Y at the firm, and that Dang would continue to service their accounts.[14]

Clients A and B never interacted with Mr. Y.[15] Instead, Dang had an arrangement with Mr. Y whereby Dang provided Mr. Y with trading instructions for Clients A and B's accounts at Mr. Y's firm.[16] As Mr. Y moved to different firms, first in 2010 and then again in 2015, Clients A and B's accounts moved with him.[17] Up through 2017, Dang spoke with Clients A and B multiple times each year, reviewing their accounts and providing investment advice.[18] These interactions occurred at times in Clients A and B's home, as well as by telephone, email, and text message.[19]

---

[10] *Id.* at 5 (¶ 18).

[11] *Ibid.*

[12] *Id.* at 5 (¶ 19).

[13] *Ibid.*

[14] *Id.* at 5 (¶ 20).

[15] *Id.* at 6 (¶ 21).

[16] *Ibid.*

[17] *Id.* at 6 (¶ 22).

[18] *Id.* at 6 (¶ 23).

[19] *Ibid.*

In December 2009, Clients A and B loaned Dang $100,000.[20] Dang did not tell Clients A and B about the $180,000 he had borrowed from and failed to repay to another client in 2006; nor has he ever repaid the $100,000 to Clients A and B.[21]

Dang also never told Clients A and B that, after 2006, he was no longer affiliated with any registered broker-dealer or investment adviser entity, that he had let his securities licenses and registrations lapse, that he had the arrangement with Mr. Y, or that he was sanctioned in 2016 by the State of Connecticut's Department of Banking.[22]

In late 2017, Dang's arrangement with Mr. Y was coming to an end.[23] During this time, Dang met with Clients A and B in person more than once, and he recommended that they open self-managed accounts on an online discount brokerage firm and transfer their retirement funds to those accounts.[24] Dang told Clients A and B that he would "continue to serve as their independent investment adviser and would continue to manage their retirement money."[25] However, even though the online brokerage "did not allow independent advisers to act on behalf of a customer's self-managed accounts," nor did it "allow advisory fees to be paid from self-managed accounts," Dang never told Clients A and B about these restrictions.[26] Dang instead told Clients A and B to provide him with their usernames and passwords for the accounts, advising them that they should pay him a 1% adviser fee in cash.[27] Clients A and B asked Dang

---

[20] *Id.* at 6 (¶ 24).

[21] *Ibid.*

[22] *Id.* at 6 (¶ 25).

[23] *Id.* at 7 (¶ 26).

[24] *Id.* at 7 (¶ 27).

[25] *Ibid.*

[26] *Id.* at 7 (¶ 29).

[27] *Id.* at 7-8 (¶ 29).

more than once whether "he had the necessary supervision and certifications to manage their retirement funds in this manner," to which Dang claimed that he did.[28]

Dang also advised Clients A and B to "authorize him to engage in a different trading strategy than he had in the past," specifically, that "a small portion of their overall retirement portfolio be allocated to trading stock options."[29] Clients A and B agreed, relying on Dang's "assurances that he would continue to invest the bulk of their retirement portfolio conservatively, prioritizing the preservation of capital."[30] They also told Dang to retain a minimum of $250,000 in cash equivalents in their accounts.[31]

In February 2018, Dang completed the process for opening four self-managed accounts, two for Client A and two for Client B.[32] Without Clients A and B's knowledge or consent, Dang chose "aggressive growth" as the investment objective for all four accounts, "speculative" as the risk tolerance for three accounts and "aggressive" for the fourth, and "options" as a type of allowed transaction for all four accounts.[33] Dang had Clients A and B add their electronic signatures to the account opening forms without their knowledge of the choices he made.[34] Clients A and B transferred a combined more than $2.2 million from the accounts held at Mr. Y's firm to the four accounts at the online brokerage and a pre-existing self-managed joint

---

[28] *Id.* at 8 (¶ 30).

[29] *Id.* at 8 (¶ 31).

[30] *Id.* at 8 (¶ 32).

[31] *Ibid.*

[32] *Id.* at 8-9 (¶ 33).

[33] *Ibid.*

[34] *Ibid.*

account.[35] They also gave Dang their usernames and passwords, which Dang used to begin

trading in the five accounts.[36]

But unlike the strategy Dang told Clients A and B he would use—an "overall

conservative investment strategy under which only a small amount of funds would be allocated

to options trading"—Dang instead "applied his risky options trading to the entirety of their five

accounts."[37] Over the course of 2018, the five accounts "plummet[ed] from more than $2.2

million combined to approximately $145,000," which was a "loss of approximately 93%."[38] By

November 2019, only $27,000 in total remained, a drop of 99%.[39]

According to the SEC, Dang "never communicated to his clients the degree to which he

engaged in aggressive options trading or the degree to which his trading failed."[40] Clients A and

B did "periodically monitor their account balances and monthly statements," and on different

occasions in 2018 and 2019, "expressed their concern to Dang, both on the telephone and via text

messaging," asking him to "explain the loss in value."[41] But each time, Dang "reassured them

and fabricated different excuses."[42] For instance, Dang sometimes told Clients A and B that

"their losses were a result of the current political climate," while other times he told them that

"the balances they saw on paper did not reflect the actual value of their holdings." [43] Dang also at

---

[35] *Id.* at 9 (¶ 34).

[36] *Id.* at 9 (¶ 35).

[37] *Id.* at 9 (¶ 36).

[38] *Id.* at 9 (¶ 37).

[39] *Ibid.*

[40] *Id.* at 10 (¶ 39).

[41] *Id.* at 10 (¶ 40).

[42] *Ibid.*

[43] *Id.* at 10 (¶ 41).

times "falsely represented that there was hidden value in the options that was not reflected in their reported balances."[44]

The SEC filed its complaint against Dang on September 10, 2020.[45] The SEC alleged violations of Section 206(1) and 206(2) of the Investment Advisers Act, seeking a permanent injunction, disgorgement of Dang's gains with prejudgment interest, and civil penalties.[46]

Dang was served on September 11, 2020.[47] On October 14, 2020, the SEC moved for default entry under Federal Rule of Civil Procedure 55(a), which the Court granted the next day. The SEC moved for default judgment on October 30, 2020, and filed supplemental briefing on December 4, 2020 in response to my order. Dang has never appeared in or filed anything in this action.

## DISCUSSION

"It is an ancient common law axiom that a defendant who defaults thereby admits all well-pleaded factual allegations contained in the complaint." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011).[48] Federal Rule of Civil Procedure 55 "provides a two-step process for the entry of judgment against a party who fails to defend: first, the entry of a default, and second, the entry of a default judgment." *Id.* at 128; Fed. R. Civ. P. 55(a)-(b). Once the clerk enters a default pursuant to Rule 55(a), "the court may, on plaintiffs' motion, enter a default judgment if liability is established as a matter of law when the factual allegations of the

---

[44] *Ibid.*

[45] Doc. #1.

[46] *Id.* at 12.

[47] Doc. #7.

[48] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

complaint are taken as true." *Bricklayers & Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Constr., LLC*, 779 F.3d 182, 187 (2d Cir. 2015). Following such a determination, a court must also determine the amount of damages to be awarded; to do so, it may conduct a hearing or it may make such a finding on the basis of documentary evidence if damages are ascertainable with reasonable certainty. *See Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999).

Although it is true that "a defendant who defaults thereby admits all well-pleaded factual allegations contained in the complaint," it is also true that "a district court need not agree that the alleged facts constitute a valid cause of action." *Mickalis Pawn Shop*, 645 F.3d at 137. That is to say, a default "only establishes a defendant's liability if those allegations are sufficient to state a cause of action against the defendant." *Taizhou Zhongneng Import & Export Co., Ltd. v. Koutsobinas*, 509 F. App'x 54, 56 (2d Cir. 2013) (default judgment wrongly entered on breach of contract claim against party who was not a party to the contract and in the absence of further factual allegations to show that the non-party was subject to veil-piercing liability for breach of contract).

A court should not grant a motion for default judgment simply because a plaintiff alleges in a conclusory fashion that a defendant has violated the law. Instead, the factual allegations in support of default judgment must establish plausible grounds for relief. Thus, a court must evaluate whether the factual allegations set forth as a basis for the default judgment motion would survive a challenge by way of a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See, e.g.*, *Belizaire v. RAV Investigative & Sec. Servs. Ltd.*, 61 F. Supp. 3d 336, 344 (S.D.N.Y. 2014); *Atl. Recording Corp. v. Brennan*, 534 F. Supp. 2d 278, 283 (D. Conn. 2008). As the Supreme Court has noted, the plausibility standard

8

that governs the adequacy of the factual allegations of a complaint "is not akin to a probability

requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### *Liability*

The SEC alleges that Dang violated sections 206(1) and 206(2) of the Investment

Advisers Act. Section 206(1) prohibits investment advisers from "employ[ing] any device,

scheme, or artifice to defraud any client or prospective client," 15 U.S.C. § 80b-6(1), while

section 206(2) prohibits investment advisers from "engag[ing] in any transaction, practice, or

course of business which operates as a fraud or deceit upon any client or prospective client," 15

U.S.C. § 80b-6(2). Section 206 also "prohibits failures to disclose material information, not just

affirmative frauds." *Dembski v. SEC*, 726 F. App'x 841, 844 (2d Cir. 2018). A misrepresentation

is material "if there is a substantial likelihood that the disclosure of the omitted fact would have

been viewed by the reasonable investor as having significantly altered the 'total mix' of

information made available." *Ibid.*

The Act defines "investment adviser" to mean "any person who, for compensation,

engages in the business of advising others, either directly or through publications or writings, . . .

as to the advisability of investing in . . . securities." 15 U.S.C. § 80b-2(11). The statute "appl[ies]

equally to registered and unregistered investment advisers." *SEC v. Illarramendi*, 260 F. Supp.

3d 166, 175 (D. Conn. 2017), *aff'd* 732 F. App'x 10 (2d Cir. 2018).

 "Scienter is required for a Section 206(1) violation but need not be found for a violation

of Section[] 206(2)," *see Dembski*, 726 F. App'x at 844 (citation omitted), which instead requires

only a showing of negligence, *SEC v. DiBella*, 587 F.3d 553, 569 (2d Cir. 2009).  For purposes

of a claim under section 206(1), "[t]he kind of recklessness required . . . is not merely a

heightened form of ordinary negligence; it is an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *SEC v. Steadman*, 967 F.2d 636, 641-42 (D.C. Cir. 1992); *SEC v. Moran*, 922 F. Supp. 867, 897 (S.D.N.Y. 1996) (same). Proof of scienter under securities laws "need not be direct, but may be a matter of inference from circumstantial evidence." *Valicenti Advisory Servs., Inc. v. SEC*, 198 F.3d 62, 65 (2d Cir. 1999) (citations and quotations omitted).

Much of the same analysis applies to determining a Section 206(2) violation as applies to analysis of a Section 206(1) violation, except that the adviser need only be negligent, and not reckless or willful, about the failure to disclose. *See Robare Grp., Ltd. v. SEC*, 922 F.3d 468, 472 (D.C. Cir. 2019); *Moran*, 922 F. Supp. at 897; *see also DiBella*, 587 F.3d at 567 (government "need not show intent to make out a section 206(2) violation"). Negligence is the failure to "exercise reasonable care under all the circumstances." *Robare Grp.*, 922 F.3d at 477 (applying negligence standard for section 206(2) claim).

Dang is alleged to have made a number of misrepresentations or omissions to Clients A and B. He never told them that he was no longer affiliated after 2006 with a registered firm; he never told them that his securities licenses and registrations had expired; he never told them about his arrangement to place trades through Mr. Y; he never told them that he had been sanctioned by the State of Connecticut; and, when they agreed to loan him $100,000, he never told them that he had previously failed to repay a loan from another client.

In late 2017 and early 2018, as his arrangement with Mr. Y came to an end, Dang had Clients A and B transfer their funds to self-managed online accounts to which he had access. Dang did not tell Clients A and B about the restrictions that existed on the accounts nor, when

confronted by Clients A and B about whether he had the "necessary supervision and certifications to manage their retirement funds in this manner," did Dang tell Clients A and B the truth. While Dang told Clients A and B that he would manage their retirement savings with a conservative investment strategy, Dang instead pursued a risky trading strategy that netted Clients A and B losses of, according to the SEC, 99% of their starting value. Nor did he retain the minimum of $250,000 in cash equivalents in their accounts that Clients A and B requested. And, when asked by Clients A and B about the losses in their accounts, Dang lied and made excuses to explain the losses and their causes.

The SEC's allegations are sufficient to state a valid cause of action. Dang's lies and omissions to Clients A and B would certainly have been considered material information by a reasonable investor and would have affected Clients A and B's decision to continue using Dang as their investment adviser over the years. In particular, Dang's lies to Clients A and B about the investment strategy he was pursuing with the self-managed accounts, in direct defiance of Clients A and B's wishes, is sufficient to state a cause of action against Dang. *See SEC v. Saxena*, 26 F. App'x 22, 23-24 (1st Cir. 2001) (finding that the fact that the defendant "supplied false and misleading information concerning the funds' management and investment strategies" was sufficient to establish violations of sections 206(1) and (2)).

Further, the SEC's allegations are sufficient to establish that Dang's actions were intentional and an "extreme departure from the standards of ordinary care," and that Dang was aware of the danger of misleading Clients A and B, especially given that, when questioned by Clients A and B, Dang lied and omitted information in an attempt to conceal his actions. Similarly, the SEC has shown that Dang failed to exercise reasonable care under all the circumstances in managing Clients A and B's retirement savings. Accordingly, I find that the

SEC has sufficiently pleaded that Dang violated sections 206(1) and 206(2) of the Investment Advisers Act.

### *Permanent Injunction*

The SEC seeks a permanent injunction restraining Dang from violating, directly or indirectly, sections 206(1) and 206(2) of the Investment Advisers Act. The Act provides that a court "shall" grant a permanent or temporary injunction "[u]pon a showing that such person has engaged, is engaged, or is about to engage in any such act or practice" constituting a violation of the Act. 15 U.S.C. § 80b-9(d). "The Second Circuit has held that this language 'require[s] a finding of "likelihood" or "propensity" to engage in future violations,'" but trial courts have "considerable discretion in granting injunctive relief pursuant to this section. There need be only a reasonable likelihood that the activity complained of will be repeated." *SEC v. Rashid*, 2020 WL 5658665, at \*25 (S.D.N.Y. 2020) (citations omitted).

In determining whether to issue a permanent injunction, courts consider the following factors: "the fact that the defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an 'isolated occurrence;' whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated." *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998); *Rashid*, 2020 WL 5658665, at \*26 (applying *Cavanagh* factors to violations under section 206).

As I stated previously, Dang's liability and scienter have been sufficiently established. While this action against Dang involves only Dang's conduct with regards to two clients, Dang's lies and omissions with regard to his relationship with those two clients date back to 2006 when he was no longer employed at a registered firm but continued to manage Clients A and B's

retirement funds through a third party, Mr. Y. After Clients A and B moved their funds to self-managed accounts at Dang's direction in early 2018, Dang continued to lie and withhold information from Clients A and B, even when confronted about the staggering losses in their accounts over the course of 2018 and 2019. Dang's previous sanctioning by the State of Connecticut with regard to his failure to repay a loan from a previous client also bears on this case, as Dang failed to disclose that sanction to Clients A and B when borrowing a large sum of money from them. And while Dang has failed to appear in this matter and it is unclear whether Dang continues to work as an investment adviser, Dang's egregious conduct is sufficient to weigh in favor of granting a permanent injunction restraining Dang from violating, directly or indirectly, sections 206(1) and 206(2) of the Investment Advisers Act.

### *Disgorgement and prejudgment interest*

The SEC also seeks disgorgement and prejudgment interest.[49] "Disgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct." *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014). It is an equitable remedy "imposed to forc[e] a defendant to give up the amount by which he was unjustly enriched." *Ibid.* (citations and quotations omitted). Further, courts have "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *Ibid.* That amount "need only be a reasonable approximation of profits causally connected to the violation" and any "risk of uncertainty in calculating disgorgement should fall upon the wrongdoer whose illegal conduct created that uncertainty." *Id.* at 305.

As the Supreme Court recently confirmed in *Liu v. SEC*, 140 S.Ct. 1936 (2020), "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is

---

[49] Doc. #10-1 at 15-16.

equitable relief permissible under § 78u(d)(5)." *Id.* at 1940. The Supreme Court made clear that courts "must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)." *Id.* at 1950. When the "entire profit of a business or undertaking results from the wrongdoing, a defendant may be denied inequitable deductions such as for personal services," but that exception "requires ascertaining whether expenses are legitimate or whether they are merely wrongful gains under another name" and determining whether expenses have "value independent of fueling a fraudulent scheme." *Ibid.*

The decision to grant prejudgment interest on top of disgorgement is also "confided to the district court's broad discretion," a decision "governed by the equities, reflecting considerations of fairness rather than a rigid theory of compensation." *Contorinis*, 743 F.3d at 307-08 (citations and quotations omitted). Requiring the payment of prejudgment interest on disgorgement amounts "is intended to deprive the wrongdoer of the benefit of holding the illicit gains over time by reasonably approximating the cost of borrowing such gain from the government." *Id.* at 308 (citation omitted).

The SEC seeks disgorgement of $6,526.22, the alleged amount of the adviser fees Dang received from Clients A and B, calculated as 1% of the amounts Clients A and B invested with Dang. As Dang has not appeared in this action, it is unclear whether Dang has any expenses— legitimate or not—to deduct from his revenue. But the entire amount of the disgorgement the SEC seeks is Dang's own compensation paid to him in cash by Clients A and B for Dang's fraudulent services. This compensation is Dang's revenue from the fraudulent scheme, and it can be disgorged as profit. *See, e.g.*, *SEC v. Fowler*, 440 F. Supp. 3d 284, 297 (S.D.N.Y. 2020) (a pre-*Liu* decision ordering disgorgement of broker commissions). I find that this is a reasonable approximation of Dang's profits and I further find that ordering disgorgement of the $6,526.22

comports with the Supreme Court's direction in *Liu* that "when the entire profit of a business or undertaking results from the wrongdoing, a defendant may be denied inequitable deductions." 140 S.Ct. at 1950. I also find that the award of prejudgment interest is proper and will add $723.23 in interest, calculated in the same manner the Internal Revenue Service uses for tax over- and underpayments, for a total amount of $7,249.45. In accordance with *Liu*, this amount shall be distributed by the SEC to the victims, whose identities are known, Clients A and B.

### *Civil penalties*

The Investment Advisers Act also provides that when "any person has violated any provision" of the Act, the court "shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation." 15 U.S.C. § 80b-9(e)(1). These penalties are set forth in a series of three tiers. The SEC seeks the third tier penalty, which, under the statute:

> shall not exceed the greater of (i) $100,000 for a natural person . . . or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation, if— (I) the violation . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and (II) such violation directly or indirectly results in substantial losses or created a significant risk of substantial losses to other persons.

15 U.S.C. § 80b-9(e)(2)(C). The third tier penalty is both the harshest of the three and requires the greatest showing, as the first tier penalty is to be determined by the court "in light of the facts and circumstances," but does not require a showing of fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement or a showing of substantial losses or a risk of substantial losses, while the second tier penalty only requires the former showing, but not the latter.

While the Act provides for penalties "for each such violation," the Act does not define the term "violation." "Case law indicates, however, that district courts have the discretion to

calculate penalties based on each violative act. Courts may look to either the number of violative transactions or the number of investors to whom illegal conduct was directed," but may also, in other cases, "focus[] on the fact that there was one fraudulent scheme, even though there were many individual violations." *Illarramendi*, 260 F. Supp. 3d at 183 (quotations and citations omitted). The factors courts look to in determining whether a penalty should be imposed and the amount of the penalty for securities violations include "(1) the egregiousness of the defendant's conduct; (2) the degree of defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *SEC v. Rosenthal*, 426 F. App'x 1, 2 (2d Cir. 2011) (quotations and citations omitted).

Dang's violations of the Investment Advisers Act involved fraud, deceit, and manipulation, resulting in substantial losses to Clients A and B. As I have noted, Dang's repeated lies and omissions to Clients A and B over the course of year, resulting in the loss of 99% of their retirement savings, is certainly egregious conduct, and the facts alleged by the SEC demonstrate a high degree of scienter on Dang's part. Dang's conduct, occurring over the course of years, with repeated lies or omissions made to Clients A and B, was not an isolated incident but rather an ongoing scheme to keep Clients A and B in the dark about the state of their retirement savings.

Because Dang has not appeared in this action, I do not know his current and future financial condition. But, given Dang's conduct and the facts alleged by the SEC, I find that a severe third tier penalty is appropriate in the approximate amount of loss that he caused his victims: $2.2 million. This amount is appropriate as a matter of deterrence to make clear to Dang

and investment advisers in general that if they operate an account by means of pervasive fraud, then they face personal liability for at least the losses that their fraud caused to be inflicted on innocent investors. Because Dang engaged in at least 22 transactions over the course of the many years he operated his clients' accounts, this penalty amount is consonant with the limitation of $100,000 per violation.

CONCLUSION

The motion for entry of default judgment against Hai Khoa Dang (Doc. #10) is GRANTED.

It is so ordered.

Dated at New Haven this 19th day of April 2021.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge